NOT DESIGNATED FOR PUBLICATION

No. 123,024

IN THE COURT OF APPEALS OF THE STATE OF KANSAS

KENNETH E. FROST,
*Appellant*,

v.

STATE OF KANSAS,
*Appellee*.

MEMORANDUM OPINION

Appeal from Johnson District Court; THOMAS KELLY RYAN, judge. Submitted without oral argument. Opinion filed April 24, 2026. Affirmed.

*David S. Patrzykont*, Attorney at Law, P.A., of Kansas City, for appellant.

*Shawn E. Minihan*, assistant district attorney, *Stephen M. Howe*, district attorney, and *Kris W. Kobach*, attorney general, for appellee.

Before WARNER, C.J., ATCHESON and CLINE, JJ.

CLINE, J.: Kenneth E. Frost appeals the denial of his K.S.A. 60-1507 motion in which he claimed his attorney provided ineffective assistance at the hearing on his motion for a new trial. And for the first time on appeal, Frost claims another attorney provided ineffective assistance at the hearing on Frost's K.S.A. 60-1507 motion. After reviewing the record, we find no error in the district court's denial of Frost's K.S.A. 60-1507 motion and we decline to take up Frost's new argument about his K.S.A. 60-1507 attorney's performance or remand that claim for a *Van Cleave* hearing. See *State v. Van*

1

*Cleave*, 239 Kan. 117, 716 P.2d 580 (1986). We therefore affirm the denial of Frost's K.S.A. 60-1507 motion.

FACTUAL AND PROCEDURAL BACKGROUND

The underlying facts of this case were set forth in Frost's direct appeal:

"Near the end of 2000 or the beginning of 2001, A.G. (Mother) started dating Frost. Several months later, Mother, her 8-year-old son B.G. (the child), and the child's twin sibling moved into Frost's home.

"After moving into the home, the child began soiling himself in his underwear. According to the child, Frost was sexually abusing him and he was 'okay' with soiling himself because he wanted Frost to think he was 'kind of gross' and to 'stay away.' Unaware of the alleged sexual abuse, Mother took the child to several doctors in an attempt to uncover the reason the child was defecating in his clothing.

"For reasons unrelated to the issues presented in this case, Mother and the children stopped living with Frost in March or April of 2002. Frost, however, continued to speak with the child and his sibling over the telephone for another 5 or 6 months. According to Mother, Frost's absence coincided with the gradual decrease and eventual cessation of the child's soiling behavior. The child's condition also improved after Dr. David Nichols, the child's primary care physician, prescribed the child medication in December 2002.

"On May 7, 2004, Mother took the child to Cindy Coggins, a licensed professional counselor, in order to have him evaluated for possible Attention Deficit Hyperactivity Disorder (ADHD). During this visit, Mother relayed to Coggins her suspicion that the child had been sexually abused. Mother stated the child was withdrawn and had experienced daily bowel problems on and off for the last 3 years, although they had stopped in the 3 weeks prior to the visit. Coggins asked the child during this visit if anyone had hurt him; the child turned to look at his mother but said nothing. Coggins ended the session, advising Mother that if anything had happened to the child, he would disclose it when he was ready.

"In the fall of 2004, Frost reportedly attempted to telephone Mother and reinitiate contact with her. When Mother discussed Frost's alleged phone call with her then fiance,

2

the child reportedly overheard the conversation and his soiling behavior resumed. Around that time, the child wrote Mother a letter stating that someone had touched him, specifically mentioning Frost's name.

"Mother called Coggins to tell her about the letter and the reoccurrence of the bowel condition. On November 30, 2004, Coggins met with Mother and the child. Mother gave Coggins the letter and, after recording notes about it, Coggins discarded the letter and conducted her second counseling session with the child. During this session, the child reported that Frost had sexually abused him on two separate occasions in two different rooms, describing each incident in detail. As a mandatory reporter, Coggins reported the suspected abuse to authorities.

"The State's investigation resulted in a referral to Sunflower House, a child advocacy center. Sarah Byall, a social worker at Sunflower House, conducted a videotaped interview of the child. During the interview, the child made disclosures consistent with his statements to Coggins.

"The State charged Frost with aggravated indecent liberties with a child. At the preliminary hearing, the child testified about two separate instances of abuse occurring in two separate rooms within the house . . . .

"Mother also testified at the preliminary hearing, stating that during the relevant time period, she sought medical treatment from Dr. Nichols for the child's bowel condition. After hearing Mother testify that the child never had experienced bowel problems before, Frost advised his attorney that Mother told him the child *did* have soiling issues prior to moving in with Frost in 2001. Frost directed his counsel, Phillip Crawford, to obtain the child's medical records.

"The district court found probable cause to bind Frost over for trial. Frost filed a motion to compel a psychological examination of the child. Finding no compelling reasons to order a psychological examination, the court denied Frost's motion.

"Although Frost requested Crawford to obtain medical records regarding the child's bowel condition, Crawford never did so. Crawford explained he requested the State to provide discoverable information supporting their theory that Frost's alleged abuse and the child's soiling problems were linked. When the State informed him that it would not be relying on medical records to support its case, Crawford filed a motion in limine requesting the district court to prohibit the State from presenting evidence that the child suffered from encopresis, a physiological or psychological condition characterized by accidental, involuntary soiling.

"In ruling on the motion, the district court agreed that evidence of an encopresis diagnosis would be hearsay and inadmissible if the State failed to call doctors to testify or present medical records. Nevertheless, the court ruled that the fact of Mother's visits to doctors and therapists for treatment of the child's bowel condition could be admitted as an exception to the hearsay rule to show the reasons supporting Mother's actions.

"At trial, Coggins testified Mother identified the child's bowel condition as encopresis, which Coggins described as a condition characterized by accidental, involuntary bowel movements. Coggins explained to the jury that, although encopresis generally stems from a physical medical condition, it also can be psychological in nature. When specifically asked whether, if psychologically grounded, the condition is consistent with a child that has been sexually abused, Coggins responded that '[i]t can be.'

"In response, Frost presented the testimony of Dr. William Logan, a physician specializing in psychiatry. According to Dr. Logan, the accidental soiling which characterizes encopresis could be caused by several things, including food allergies, gastrointestinal problems, or anxiety. From what Dr. Logan could garner from his review of the child's history, there were several potential causes of the child's soiling problem, including developmental delays, relocations, parental relationships, and numerous school changes. Dr. Logan's testimony stressed that encopresis could result from any of these anxiety provoking phenomena, not just sexual abuse.

. . . .

"Frost also testified at trial, denying that . . . any fondling or other sexual contact occurred.

"The jury ultimately convicted Frost of aggravated indecent liberties with a child. Frost requested new counsel and filed a motion alleging he was entitled to a new trial because he had received ineffective assistance from Crawford. Specifically, Frost faulted Crawford for failing to obtain the child's medical records. Frost contended these records establish that Dr. Nichols first treated the child for soiling himself in September 1996, approximately 5 years before he met Frost. Frost further contended the records included a note dated August 19, 2002, that read 'school needs note to have juice instead of milk. [The child] has bowel movement accidents if he drinks milk.' Additionally, Frost claimed that Crawford failed to present evidence that Mother told witnesses before trial that she would '"send [Frost] back to prison one way or another."' After an evidentiary hearing, the district court concluded Crawford effectively represented Frost at trial and,

4

accordingly, denied Frost's motion for new trial." *State v. Frost*, No. 98,433, 2009 WL 2371007, at *1-3 (Kan. App. 2009) (unpublished opinion).

Our court affirmed Frost's conviction. 2009 WL 2371007, at *1. In making this determination, we found Frost's trial counsel provided deficient performance by failing to request the child's medical records, but we concluded that counsel's performance did not prejudice Frost. 2009 WL 2371007, at *3-9. After the Kansas Supreme Court denied discretionary review, Frost unsuccessfully sought habeas relief in federal court. *Frost v. Pryor*, 749 F.3d 1212, 1215 (10th Cir. 2014).

Frost then filed the K.S.A. 60-1507 motion that is the subject of this appeal. He challenged, among other things, his counsel's performance at the hearing on his motion for a new trial for failing to present evidence to impeach the credibility of Mother and the child.

At the hearing on Frost's K.S.A. 60-1507 motion, the State stipulated that Frost received ineffective assistance of counsel at the hearing on the motion for a new trial, so the arguments and evidence addressed whether Frost was prejudiced by his counsel's deficient performance. His new attorney, Kate Zigtema, focused on the prior attorney's failure to call Mother and the child at the hearing on the motion for a new trial to impeach them with the child's medical records.

Zigtema questioned both Mother and the child, now an adult, at the K.S.A. 60-1507 hearing about the medical records. The victim did not remember any bowel issues or soiling himself before Frost's abuse. The victim said the incidents in 2001 and 2002 were an intentional decision to keep Frost away from him. Mother distinguished the child's bowel movements when Frost was around, saying the victim never stayed in soiled clothes for a period of time before Frost was around.

5

The district court ultimately denied Frost's K.S.A. 60-1507 motion, finding Frost failed to show he was prejudiced by his counsel's failure to call Mother and the child at the motion for a new trial hearing. The court pointed out that neither Mother nor the child had much memory of the doctor visit in 1996 and that the child had no further incidents after that until Frost came into their lives. The court also noted how Mother distinguished the prior soiling incidents from the ones when Frost was around and how Frost's expert admitted at trial that molestation is one possible explanation for a child's regression in toilet training. Last, the district court relied on the fact that our court found Frost was not prejudiced by Frost's trial attorney's failure to obtain the medical records of the 1996 incident for trial. Frost appeals this decision.

REVIEW OF FROST'S APPELLATE CHALLENGES

I. *Jurisdiction and Mootness*

Before we turn to the merits of Frost's claims, we must address our court's jurisdiction to hear them. Frost admits he was released from custody before briefing this appeal. While the State agrees we have jurisdiction over Frost's appeal, we have a duty to question jurisdiction on our own initiative. *Mundy v. State*, 307 Kan. 280, 286, 408 P.3d 965 (2018).

If a K.S.A. 60-1507 motion is filed while a prisoner is in custody, jurisdiction is not lost if the movant is released before judgment on the motion becomes final. 307 Kan. at 288. That said, whether the movant's claim becomes moot upon their release is another question.

In determining whether Frost's claim is moot, we must evaluate whether our decision could impact any collateral consequences to his conviction. 307 Kan. at 289.

Here, Frost is subject to lifetime registration as a sex offender based on his conviction. Therefore, we find his claim is not moot.

II. *The district court did not err in denying Frost's K.S.A. 60-1507 motion for ineffective assistance of counsel by Carl Cornwell.*

Frost first argues the district court erred when it found Carl Cornwell's deficient performance at the hearing on Frost's motion for a new trial was not prejudicial. He claims there was no strategic reason not to call Mother and the child to testify, so Cornwell could impeach their testimony with the medical records. Although Cornwell questioned Dr. Nichols about the records, Frost claims the district court did not get the "entire picture."

*Standard of Review and Relevant Legal Framework*

Because the district court held a full evidentiary hearing on Frost's motion, we review the court's findings of fact to determine whether they are supported by substantial competent evidence and are sufficient to support the court's conclusions of law. *State v. Evans*, 315 Kan. 211, 218, 506 P.3d 260 (2022). Substantial competent evidence refers to legal and relevant evidence a reasonable person could find adequately supports a conclusion. *Granados v. Wilson*, 317 Kan. 34, 41, 523 P.3d 501 (2023). And in reviewing whether there was substantial competent evidence this court cannot weigh conflicting evidence, evaluate the credibility of witnesses, or otherwise redetermine questions of fact. *White v. State*, 308 Kan. 491, 504, 421 P.3d 718 (2018). Appellate review of the district court's conclusions of law is de novo. *Khalil-Alsalaami v. State*, 313 Kan. 472, 486, 486 P.3d 1216 (2021).

Claims of ineffective assistance of defense counsel are analyzed under the two prong test articulated in *Strickland v. Washington*, 466 U.S. 668, 687, 104 S. Ct. 2052, 80 L. Ed. 2d 674 (1984), and adopted by the Kansas Supreme Court in *Chamberlain v. State*,

236 Kan. 650, 656-57, 694 P.2d 468 (1985). Under the first prong, the defendant must show their counsel's performance was deficient. And under the second prong, the defendant must show there is a reasonable probability that, absent their counsel's deficiencies, the result would have been different. *Evans*, 315 Kan. at 218. A reasonable probability is a probability sufficient to undermine confidence in the outcome. 315 Kan. at 218.

Here the district court only assessed the second prong of the *Strickland* test because the parties stipulated that Cornwell's performance was deficient. Thus, we need only examine whether Frost has shown there was a reasonable probability that if Cornwell had called Mother and the child to testify at his motion for a new trial hearing, the district court would have granted his motion.

*Frost fails to establish Cornwell's assistance was prejudicial.*

Frost claims by not calling Mother and the child, Cornwell could not cross-examine them about the medical records of the child's 1996 visit with Dr. David Nichols that Crawford (Frost's trial attorney) failed to obtain before trial. Instead, as Frost points out, Cornwell only questioned Dr. Nichols about these records. Frost claims that Mother's and the child's assertions that the child had no soiling incidents before Frost's alleged abuse was a key part of the State's case. And he contends these assertions are contradicted by the medical records.

But Frost fails to explain how questioning Mother and the child about the sole medical visit in 1996, or even the soiling incidents that prompted this visit, would have changed the outcome. As the district court pointed out, neither Mother nor child remembered the prior soiling incidents. Although Frost is skeptical of Mother's claimed memory lapse, he does not address the court's point that Mother still distinguished the prior incidents from the behavior the child displayed when Frost was around. And the

8

child had no incidents after 1996 until 2001, when Frost came into their lives. These facts undercut the significance of the points Frost claims Cornwell should have made on cross-examination of Mother and the child.

The State also points out that the United States Court of Appeals for the Tenth Circuit, when looking at Frost's federal habeas claim, found that while Mother's credibility might have been weakened by the medical records, it is unlikely that the child's would have been:

> "Although the medical records may weaken the mother's credibility, they do not materially undermine the child's. It was the child, not his mother, who testified at trial about the two alleged incidents of sexual abuse. His testimony established the elements of the offense, specifically identifying Mr. Frost. The [Kansas Court of Appeals] reasonably concluded that the value of impeaching a thirteen-year-old over whether he remembered soiling himself when he was four years old was limited when compared with the other evidence indicating Mr. Frost's guilt. Indeed, although the child denied having accidents before meeting Mr. Frost, . . . he could not even remember precisely how long he had been having the accidents between the ages of nine and twelve. When asked whether he had 'been having trouble with those accidents for about three years' before seeing [licensed professional counselor] Ms. Coggins in May 2004, the child responded, 'I don't remember.' [Citations omitted.]" *Pryor*, 749 F.3d at 1228-29.

Although Cornwell did not impeach Mother's and the child's memories about the timing of the encopresis, he did question Dr. Nichols about the past incidents and medical records, so that evidence was brought to the district court's attention. And Cornwell attacked the credibility of the child's trial testimony in other ways because he argued that the child testified there were many details and facts he could not remember. Cornwell also indirectly attacked Mother's credibility when he questioned Phillip Crawford (Frost's trial attorney) about his memory of Mother's trial testimony, where according to Crawford she could never identify which doctor said the child had encopresis.

9

In sum, given the other efforts to impeach Mother's and the child's credibility at the hearing, and the evidence admitted about the medical records at this hearing, we do not see a reasonable probability that the outcome on Frost's motion for a new trial would have been different had Cornwell questioned Mother and the child about the medical records. And since we found on direct appeal that the jury would not have reached a different result had it been presented with the medical records, it is hard to say Frost should be entitled to a new trial simply because Mother and the child were not questioned about them. See *Frost*, 2009 WL 2371007, at *5.

The district court's findings of fact are supported by substantial competent evidence and are sufficient to support the court's conclusions of law in denying Frost's K.S.A. 60-1507 motion. We therefore affirm its decision.

III. *Frost does not persuade us to take up, for the first time on appeal, his claim that Zigtema was ineffective or his request to remand his case for a* Van Cleave *hearing.*

Next Frost claims his counsel from the evidentiary hearing on his K.S.A. 60-1507 motion (Zigtema) was ineffective because she abandoned most of his claims and failed to call Cornwell as a witness at the evidentiary hearing. The State responds that this issue is not preserved for appellate review, there is no evidence to address Zigtema's strategy, and remand for a *Van Cleave* hearing is not appropriate.

*Standard of Review and Relevant Legal Framework*

In general, ineffective assistance of counsel claims will not be heard for the first time on appeal. *Rowland v. State*, 289 Kan. 1076, 1084, 219 P.3d 1212 (2009). The district court, who observed counsel's performance and is aware of the trial strategy employed, is in a much better position to consider the competence of counsel and should have the first opportunity to rule on the issue. *Van Cleave*, 239 Kan. at 119-20. As a result, when a defendant newly raises such a claim on appeal, appellate courts have three

options: (1) Follow the general rule and refuse to address the issue, allowing the defendant to pursue relief through a K.S.A. 60-1507 motion; (2) rule on the merits in the "extremely rare" cases that there is a sufficient record to do so; or (3) remand the case for a *Van Cleave* hearing "so that facts relevant to determination of the legal issue may be developed and an evidentiary record established." *Rowland*, 289 Kan. at 1084-85; see *State v. Reed*, 302 Kan. 227, 233-34, 352 P.3d 530 (2015). Whether to remand a case for a *Van Cleave* hearing lies within the sound discretion of the appellate court. 239 Kan. at 120.

> *Given this record, we cannot review Zigtema's performance for the first time on appeal, and Frost does not persuade us that a* Van Cleave *hearing is appropriate.*

To support his claim that Zigtema was ineffective, Frost points out that he raised 10 issues in his K.S.A. 60-1507 motion, yet Zigtema only addressed his claim of actual innocence and the ineffective assistance of his counsel at the hearing on his motion for a new trial. But Frost simply lists the eight claims Zigtema did not pursue—he offers no explanation on the alleged merits of any of those claims, which included counsel's failure to object to his criminal history score and sentencing as a persistent sex offender, failure to obtain records from what is now the Kansas Department for Children and Families, failure to enter into an agreement with the prosecutor to admit his polygraph results, ineffective assistance of counsel in federal courts, the State's failure to provide exculpatory evidence in its possession, a jurisdiction issue regarding the amended complaint, and cumulative error.

Yet to warrant remand for a *Van Cleave* hearing, counsel must provide some basis to show the ineffective assistance of counsel claim has some merit. An allegation that things should have been done differently—like we have here—is not enough. See *State v. Beachy*, No. 105,514, 2011 WL 5143134, at *3 (Kan. App. 2011) (unpublished opinion).

11

Frost also does not explain how the record is sufficient for this court to review Zigtema's effectiveness for the first time appeal. In fact, Frost even admits: "It is unknown from the record why Zigtema abandoned the remaining issues." These could have been strategic decisions, which our Supreme Court has consistently said rests with the lawyer. *State v. Cheatham*, 296 Kan. 417, 445-46, 292 P.3d 318 (2013).

By way of example, when Frost contends Zigtema failed to address Cornwell's failure to object to his criminal history score and sentencing as a persistent sex offender, it is unclear what should have been or could have been done. But further explanation is necessary because on direct appeal, Frost argued "the district court should have been required to prove his prior convictions to a jury beyond a reasonable doubt before using his criminal history to enhance his sentence." *Frost*, 2009 WL 2371007, at *12. Given that he has already raised a similar issue, we cannot determine whether the argument he claims Zigtema should have made was already addressed or whether he believes she should have made a different one.

In short, Frost has failed to provide a sufficient basis for our court to consider his claims or for us to remand them for a *Van Cleave* hearing. We therefore decline to do so.

Affirmed.